**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 09a0074n.06
Filed: January 29, 2009

**No. 08-5464**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| JAMES T. MARR, JR., | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | **ON APPEAL** FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| COMMONWEALTH LAND TITLE | ) | WESTERN DISTRICT OF KENTUCKY |
| INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant-Appellee. | ) | |
| | ) | |

**BEFORE:     MERRITT, MOORE  and COLE, Circuit Judges.**

**MERRITT, Circuit Judge.**  This is a "collateral estoppel" case arising from diversity of citizenship, a case in which the claims and defenses of both parties were difficult for the District Court to follow and for us to adjudicate on appeal.  We will do our best to clarify the situation.  In an action on a title insurance policy, Thomas Marr, the plaintiff-insured, sued the Commonwealth Land Title Insurance Company in the District Court.  Marr alleged that Commonwealth (1) breached his title insurance contract by not covering his losses sustained in paying off lienholders on the subject property, (2) breached its duty to defend him in a Kentucky state court foreclosure action, and (3) acted in bad faith by denying his claim for losses and refusing to defend him in court.

In its defense, Commonwealth asserted that Marr failed to comply with a clause in the policy excluding losses from "liens" known to the insured but "not disclosed in writing to the company" prior to the date of the policy. The specific issue appears to be whether Marr's conduct vitiated coverage under the 3(a) and (b) "exclusion."[1] This defense, and Commonwealth's collateral estoppel argument, were based on a prior state court finding in a Kentucky foreclosure action in which Commonwealth was not a party. The prior opinion had found that Marr had knowledge of unsatisfied liens because he knew that the person from whom he bought the house had acquired its title through a so-called "sham" sale-and-leaseback transaction designed to shield the original homeowner from his would-be creditors while allowing him to continue residing there.

Applying rules of issue preclusion embraced in the doctrines of *res judicata* and collateral estoppel, the District Court held that Marr was precluded from relitigating the state court's findings in federal court. Then, relying *entirely* on Marr's judicial admission that "Commonwealth would not be liable . . . if he is collaterally estopped from denying the findings," Mem. Op. at 6, J.A. at 24,

---

[1]The relevant provision of the title insurance policy relied upon by Commonwealth reads as follows:

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by means of:

. . . .

3. Defects, *liens*, encumbrances, adverse claims or other matters:
      (a) created, suffered, assumed or agreed to by the insured claimant;
      (b) *not known to the Company, not recorded in the public records at Date of Policy*, but known to the insured claimant *and not disclosed in writing to the Company* by its insured claimant prior to the date the insured claimant became an insured under this policy;

Appellee's Br. at 7, J.A. at 417 (emphasis added).

the District Court held that Marr "cannot establish that Commonwealth breached the contract" and accordingly granted summary judgment in its favor.  *Id.* at 10, J.A. at 28.

The primary question on appeal is whether the District Court was correct in its application of the law of judicial admissions and issue preclusion, and whether the facts so established justified summary judgment.  We conclude that the District Court read the doctrine of judicial admissions too broadly, and we believe that the previous state court opinion did not find all the facts necessary to satisfy exclusion 3(a) and (b).  Given the over-broad interpretation of the judicial admission and the lack of concordance between the state court findings and the facts necessary to satisfy the exclusion, we hold that summary judgment was improper and remand for further proceedings.

## I.  Facts

### A.  Property Transactions Prior to Title Insurance

In July 1980, Norman Culbertson acquired legal title to the subject property, a home in Louisville, Kentucky.  Beginning in 1991, creditors National City Bank-Kentucky, National City Bank-Indiana, and Thomas Grote brought legal actions against Culbertson.  In July 1994, before any judgments were filed in those actions, Culbertson conveyed his formal interest in the home to a business partner, Layne Smith, through a sale-and-leaseback.  Under the terms of the agreement, Culbertson gave Smith fee simple title to the home, Smith satisfied all existing liens on the property, Culbertson maintained an option to repurchase the home at the purchase price (plus interest), and Culbertson made periodic interest payments to Smith in exchange for continuing to live in the home.  In 1995, the creditors obtained and recorded judgment liens against Culbertson.  In 1996, Culbertson

filed for Chapter 7 bankruptcy protection, receiving a discharge the following year; but the judgment liens remained as a cloud on the title to the property.

Later Culbertson approached plaintiff Marr for a loan to finance a business venture, offering his home as collateral. Marr was in the mortgage lending business. Marr discovered that Culbertson had already conveyed his interest in the home to Smith. To secure the loan to Culbertson, Marr had Culbertson assign to him his right to repurchase and bought the home from Smith. Marr made a mortgage loan on the property from Bedford Bank. He then executed a so-called "contract for deed" with Culbertson which conveyed equitable title to Culbertson and allowed him to remain on the property in exchange for regular installment payments toward the title and incremental repayment of the loan.

## B. The Title Insurance

Incident to the mortgage, Marr and Bedford Bank purchased title insurance policies, insuring their respective interests, issued by Commonwealth dated January 12, 1998. In "Schedule B. Exceptions From Coverage," the title insurance policy did not exclude the creditor liens against the property obtained and recorded in 1995.[2] The record does not explain the reason the title insurance

---

[2]Schedule B reads as follows:

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:

1. Rights or claims of parties other than Insured in actual possession of any or all of the property.

2. Unrecorded easements, discrepancies or conflicts in boundary lines, shortage in area and encroachments which an accurate and complete survey would disclose.

    3. Lien of 1998 State and County taxes, not yet due and payable.
    4. Variable Building Limit of from 30 feet to 40 feet, and Electric and Telephone

company failed to exclude these liens from coverage. But it is clear that Commonwealth was aware of these liens because on December 18, 1998 (three weeks before the date of the policy), Commonwealth had issued a contractual "Commitment for Title Insurance." The "Commitment" contained the following language reciting the existence of creditor liens on the property, and the book and page of the records where they were recorded: "7. Pay and have released the liens filed in Miscellaneous Liens and Encumbrance Book 416, Page 39, Book 441, Page 506, Book 433, Page 474, Book 433, Page 475, Book 454, Page 572, and Book 454, Page 89, all in the office aforesaid." J.A. at 438. The record discloses that the liens were not paid off and remained as clouds on the title to the property. Since Commonwealth was apparently aware of the recorded liens, it is unclear why Commonwealth contends that exclusion 3(b) is satisfied, a defense that requires on its face that the "liens" should be "not known to the company" and "not recorded."

## C. The Kentucky State Court Foreclosure Action

---

easement over the rear 7.5 feet, together with incidental rights, as shown on the recorded plat aforesaid.

5. Restrictions, and stipulations of record in Deed Book 3387, Page 378, and Deed Book 3411, Page 423, both in the office aforesaid.

6. Variable Sewer and Drain easement of record in Deed Book 4839, Page 794, in the office aforesaid.

7. Mortgage from James T. Marr, Jr. and Linda B. Marr, husband and wife, to Bedford Loan & Deposit bank, dated January 9, 1998, in the original principal amount of $200,000 and recorded January 9, 1998 at 3:40 p.m. in Mortgage Book 3598, page 266, in the Office of the Clerk of the County Court of Jefferson County, Kentucky.

8. Contract for Deed between J. Thomas Marr, Jr. and Linda B. Marr, sellers and Norman G. Culbertson and Debra A. Culbertson, buyers, dated January 9, 1998 recorded January 12, 1998 at 3:32 p.m. in Deed Book 6985, Page 381 in the office aforesaid.

Eventually, Culbertson defaulted on his payments to Marr. On May 23, 2003, Marr filed a foreclosure action in Jefferson County Circuit Court to extinguish Culbertson's equitable contract-for-deed interest. In addition to Culbertson, Marr's foreclosure action named Bedford Bank and Culbertson's preexisting creditors as defendants. The Circuit Court referred the foreclosure action to a so-called "Master Commissioner" to determine the priority of the competing claims to the property. The Master Commissioner held four hearings on the subject. By the close of the hearings, the "parties ha[d] briefed th[e] matter and all agree[d] that the matter is ripe for Judgment." Master Commissioner's Report [hereinafter Report], J.A. at 64. On October 7, 2004, the Master Commissioner issued a detailed report.

The Report concluded that Smith, a business partner of Culbertson, had "at least some knowledge of Culbertson's financial and legal entanglements." *Id.* at 63. Looking to the 1994 agreement between Smith and Culbertson, the Report found that it was a "refinancing agreement and nothing more."[3] *Id.* at 67. It concluded that Culbertson sought to divest himself of formal ownership to keep his home out of the reach of his creditors. To do so, he purported to convey fee simple ownership to Smith. Applying Kentucky law to the facts, the Report concluded that "sham

---

[3]In full, the Report found that:

> [T]he conveyance to the Smiths was a refinancing agreement and nothing more. The Smiths never acquired indicia of genuine ownership. The Smiths did not assume the position of owner or landlord but that of a mortgagee. Given the variety of legal problems facing Norman Culbertson at the time of that 1994 "sale" it is not difficult to surmise why the Culbertsons might wish to divest themselves of legal title to the property. Nonetheless, sham ownership is no ownership at all. Ownership of the property remained with the Culbertsons regardless of the name the Culbertsons and Smiths choose to give to their transaction.

Report, J.A. at 67 (internal citations omitted).

ownership is no ownership at all" and that the 1994 transaction between Culbertson and Smith must instead be treated as a "mortgage." *Id.* In turn, the creditors' 1995 judgment liens validly attached to the home. *Id.*

As to the 1998 "sale" from Smith to Marr giving rise to the instant title insurance dispute, the Report noted that Smith could not legally convey a greater interest in the home than that which he actually possessed. The result was that Marr obtained only a mortgage interest in the home — subject to the preexisting liens by Culbertson's creditors. *Id.* at 68. Marr responded that he purchased the home in good faith and was, therefore, entitled to priority under the bona fide purchaser doctrine. But the Report found that, like Smith, Marr was "a business partner of Norman Culbertson and had at least some knowledge of Culbertson's financial and legal entanglements." *Id.* at 66. It went on to explain:

> The facts of this case do not support any claim by Marr to be a bona fide purchaser. Although Marr clearly gave value for the property, all evidence indicates that he did so under precisely the same circumstances as the Smiths. Marr was apparently aware of Culbertson'[s] need to shield his property from creditors and understood that the previous conveyance to the Smiths was only a means of refinancing Culbertson's debts. In fact Marr's only claim to this Court to the contrary was his assertion that the Court must give effect to the form the parties choose to give to the transactions. . . . Even if [Marr's] knowledge of the facts was imperfect or incomplete, he certainly was aware that his "purchase" from the Smiths was not the arms [sic] length "sale" it purported to be. That alone is sufficient to place Marr on notice . . . that any interest he acquired in the property might be subject to other liens.

*Id.* at 68. It is not clear what relevance this finding has to Marr's claims against the title insurance company.

The Report also found that Bedford Bank was wholly unaware of the nature of the transactions between Culbertson, Smith, and Marr, and that it was thus protected under the bona fide

purchaser doctrine. *Id.* at 68. In turn, Bedford Bank's interest in the property was adjudged to be superior to all others, *id.* at 69, despite the fact that the creditor's liens were prior in time and also reported to the Bank in the December 18 "Commitment" letter.

Following the release of the Report, Marr notified Commonwealth that he was filing objections to it with the Circuit Court. Commonwealth then responded that it would no longer pay for Marr's efforts to defend his title.

In his objection to the Circuit Court, Marr argued that the findings in the Report — namely those in response to his claim to be a bona fide purchaser — were not supported by facts in the record. On April 14, 2005, over Marr's objections, the Circuit Court confirmed and adopted the Report in full. *See* Op. and Order Confirming and Adopting Comm'rs Rep., J.A. at 73-84. Marr then filed a motion to reconsider. While the motion was still pending, however, Marr settled with Culbertson's creditors for a combined total of $80,000. Commonwealth refused to cover these losses under his title insurance policy.

### D. The Lawsuit Against Commonwealth

After settling with the creditors, Marr sued Commonwealth in Jefferson County Circuit Court. Marr alleged that Commonwealth breached its title insurance contract by not covering his losses, breached its duty to defend by not paying for his defense in the foreclosure action, and acted in bad faith by denying his claim and refusing to defend him. On January 13, 2006, Commonwealth removed the action to the United States District Court for the Western District of Kentucky.

On July 16, 2007, the parties filed competing motions for summary judgment. On March 4, 2008, the District Court issued a memorandum opinion granting Commonwealth's motion for

summary judgment in full and denying Marr's partial motion for summary judgment. *See* Mem. Op.,

J.A. at 19-29. Accordingly, Marr's claims were dismissed with prejudice. *See* Order, J.A. at 30.

In pertinent part, the District Court ruled that Marr was "collaterally estopped" from

challenging the findings of the Master Commissioners and the Jefferson County Circuit Court,

particularly the finding that Culbertson, Smith, and Marr had engaged in "sham" transactions.[4] The

District Court then concluded that this finding voided Marr's coverage under the title insurance

policy.

## II. Analysis

It is undisputed that Commonwealth pulled its defense of Marr in the state foreclosure action

and later refused to cover the losses he sustained in settling with Culbertson's creditors. Whether

Commonwealth is liable to Marr appears to turn on whether his conduct breached or otherwise

voided his coverage under his title insurance policy. But the District Court never specifically

---

[4]The opinion reads in part as follows:

Marr contends that Commonwealth breached its contract with him by not providing coverage under
the terms of his owner's title insurance policy. He claims that Commonwealth is obligated to cover
the loss he suffered as a result of the judgment creditors' claims of having superior interests at the
Knollwood property. He also contends that Commonwealth breached its duty to defend him in the
foreclosure action. Commonwealth contends that Marr's loss is not covered under the terms of the
policy and that it owed no duty to defend him.

. . . .

In the state court foreclosure action, the Commissioner concluded, and the Circuit Court agreed, that
Marr's interest in the Knollwood property was subject to the liens of Culbertson's judgment creditors.
In so concluding, the Commissioner and Circuit Court found that Culbertson, Smith, and Marr entered
into a "sham transaction" and that Marr was not a bona fide purchaser of the property . . . . Thus, *the
issue in this proceeding is the same as the issue in the foreclosure proceeding* and the first element
of the *Yeoman* [collateral estoppel] test is met.

Mem. Op. at 5, 8, J.A. at 23, 26 (emphasis added).

addressed this question. Instead, it relied on an admission of a legal conclusion by Marr's counsel that his client would lose if precluded from challenging the factual findings of the Kentucky state court. *See* Mem. Op. at 6, J.A. at 24. It is unclear why Marr's counsel made this concession or what he meant by it.

Unlike admissions of fact, "legal conclusions are rarely considered to be binding judicial admissions." *Commercial Money Ctr., Inc., v. Ill. Union Ins. Co.*, 508 F.3d 327, 336 (6th Cir 2007). For this reason, where a "counsel's statements dealt with opinions and legal conclusions," this court is "reluctant to treat them as binding judicial admissions." *MacDonald v. Gen. Motors Corp.*, 110 F.3d 337, 341 (6th Cir. 1997) (quoting *Glick v. White Motor Co.*, 458 F.2d 1287, 1291 (3d Cir. 1972) ("The scope of judicial admissions is restricted to matters of fact which otherwise would require evidentiary proof, and does not include counsel's statement of his conception of the legal theory of a case.")).

Even though the "Commitment" letter states on its face that the insurance company was aware of the recorded liens, Marr's counsel appears to have conceded in a general way that, if Marr is collaterally estopped from challenging the factual findings of the Kentucky state court, Commonwealth would not be liable. As stated above, it is unclear from the record what precisely Marr's counsel intended to concede. Perhaps he had not read exclusion 3(a) and (b) and Schedule B closely and he thought (erroneously) that if Marr knew of the nature of the "sale" from Culbertson to Smith (and failed to disclose it to Commonwealth), he would necessarily void the title insurance policy. But such a concession amounts to a *legal* conclusion about the construction of the title

insurance contract and the facts necessary to satisfy exclusion 3(a) and (b) and Schedule B — facts discussed in neither the prior Kentucky case nor in the opinion of the court below.

Neither the Report nor the Circuit Court confirmation mentions anything about the title insurance policy or purports to make findings or conclusions respecting the legal relations between Marr and Commonwealth. Nevertheless, it is conceivable (for reasons we do not now perceive) that the factual finding about Marr's knowledge of the nature of the sale between Culbertson and Smith might be at least relevant in determining if he voided his title insurance policy. But first the District Court must set out precisely the factual elements of Commonwealth's defense that are necessary to avoid coverage under the policy and then must show that those very facts were found by the Kentucky court in order to invoke issue preclusion. For a cause of action or a defense to be foreclosed by issue preclusion based on previous fact finding, a court must show that there is a congruence or concordance between the facts previously found and the elements of the cause of action or the defense in the new action. The District Court has not performed that analysis and neither have the parties in their briefs on appeal.

Issue preclusion is not difficult to apply. Federal courts must afford state court judgments the same preclusive effect that the judgments would have in state court. *See* 28 U.S.C. § 1738; *Marrese v. American Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 384 (1985). Under Kentucky law, there are four elements to issue preclusion: (1) the issue in the second proceeding must be the same as the issue in the first; (2) the issue must have been actually litigated; (3) the issue must have been actually decided; and (4) the decision on the issue must have been a necessary component of the prior proceeding. *Yeoman v. Commonwealth Health Policy Bd.*, 983 S.W.2d 459, 465 (Ky. 1998)

(relying on RESTATEMENT (SECOND), JUDGMENTS § 27 (1982)). So far none of these four elements of the rule of issue preclusion has been separated out and established in this case.

The District Court should at least make findings of fact and conclusions specifically with respect to Commonwealth's defense under exclusion 3(a) and (b) and any other defenses previously raised, as well as the legal effect of Commonwealth's Commitment letter and its apparent failure to list the creditor liens as exceptions to coverage under the policy.

Accordingly, the judgment of the District Court is reversed and the case is remanded for further proceedings consistent with this opinion.